IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

Zachariah Wendell Bruce,                    )        Civil Action No.  8:15-cv-00261-BHH-JDA
                                             )
                           Plaintiff,        )        **REPORT AND RECOMMENDATION**
                                             )        **OF MAGISTRATE JUDGE**
                vs.                          )
                                             )
Carolyn W. Colvin,                           )
Commissioner of Social Security,             )
                                             )
                          Defendant.         )

        This matter is before the Court for a Report and Recommendation pursuant to Local

Civil Rule 73.02(B)(2)(a), D.S.C., and 28 U.S.C. § 636(b)(1)(B).[1]  Plaintiff brought this

action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final

decision of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's

claim for supplemental security income ("SSI").  Plaintiff previously received SSI benefits

based on disability as a child.[2]  [R. 12.]  As required by law, eligibility for these disability

benefits was redetermined under the rules for determining disability in adults when Plaintiff

---

[1]A Report and Recommendation is being filed in this case, in which one or both parties declined to consent to disposition by a magistrate judge.

[2]An individual under the age of 18 is entitled to child's benefits on the earnings record of an insured person who is entitled to old-age or disability benefits or who has died if the individual is the insured person's child; is dependent on the insured; is unmarried and applies; and is under age 18 or is 18 years old or older and has a disability that began before she became 22 years old, or is 18 years or older and qualifies for benefits as a full-time student. 20 C.F.R. § 404. 350(a). For purposes of child's benefits and SSI, the term "disability" means an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U .S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).

attained age 18.[3] [R. 12.]  For the reasons set forth below, it is recommended that the decision of the Commissioner be reversed and remanded for administrative action consistent with this recommendation, pursuant to sentence four of 42 U.S.C. § 405(g).

## PROCEDURAL HISTORY

On December 7, 2005, Plaintiff filed an application for SSI.  [R. 157-159.]  The claim was approved by the Social Security Administration ("the Administration"); the favorable decision, however, is not a part of the record before the Court.  On June 14, 2011, Plaintiff was advised that his benefits would cease based on an Age 18 redetermination.  [R. 73, 77–79.]  Plaintiff filed a request for reconsideration on August 12, 2011 [R. 80–82] and another decision finding that Plaintiff was no longer disabled was issued by the Administration.  [R. 86-109.]  Plaintiff requested a hearing before an administrative law judge ("ALJ") and on July 22, 2013, ALJ Peggy McFadden-Elmore conducted a hearing on Plaintiff's claim.  [R. 29–72.]

The ALJ issued a decision on October 18, 2013, finding Plaintiff not disabled.  [R. 9–28.]  At Step 1,[4] the ALJ found Plaintiff attained age 18 on January 13, 2011, and was eligible for SSI benefits as a child for the month preceding the month in which he attained

---

[3]A showing of medical improvement is not required for age eighteen re-determinations: "[w]here an individual was eligible for SSI benefits as a child, the Commissioner must, for the month preceding the month in which [he] attains age eighteen, re-determine h[is] disability. A showing of medical improvement is not required in these redetermination cases.  Instead, the definition of disability used for adults who file new applications for SSI benefits based on disability applies." *Wells v. Comm'r of Soc. Sec.*, No. 6:09-cv-1669-Orl-28DAB, 2011 WL 722764 *3 (M.D. Fla. January 21, 2011); *see also* 42 U.S.C. § 1382c(a)(3)(H)(iii).

[4]The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra*.

age 18.  [R. 14, Finding 1.]  At Step 2, the ALJ found Plaintiff had the following severe impairment: intellectual disability.  [R. 14, Finding 2.]  The ALJ also noted that Plaintiff received treatment for attention-deficit/hyperactivity disorder ("ADHD") but that his ADHD did not involve any significant additional limitations. [*Id.*]  At Step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  [R. 15, Finding 3.]  The ALJ expressly considered Listings 12.05(C) and 12.02.  [R. 15–16.]

Before addressing Step 4, Plaintiff's ability to perform his past relevant work, the ALJ found Plaintiff retained the following residual functional capacity ("RFC")

> After careful consideration of the entire record, I find that since June 30, 2011, the claimant has had the residual functional capacity to perform a range of work at all exertional levels but with the following nonexertional limitations: by reason of his mental impairments, he is restricted to simple, unskilled work, requiring no interaction with the public and no reading or math skills above a third-grade level.

[R. 16–17.]

At Step 4, the ALJ noted Plaintiff had no past relevant work.  [R. 21, Finding 5.] Considering Plaintiff's age, limited education, ability to communicate in English, RFC, and the testimony of a vocational expert, the ALJ determined that there are  jobs that exist in significant numbers in the national economy that Plaintiff can perform.  [R. 21, Finding 9.] On this basis, the ALJ found Plaintiff's  disability ended on June 30, 2011, and that Plaintiff has not become disabled again since that date.  [R. 22, Finding 10.]

Plaintiff requested Appeals Council review of the ALJ's decision but the Council declined.  [R. 1–6. ] Plaintiff filed this action for judicial review on January 20, 2015.  [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends that the Commissioner erred in failing to find that Plaintiff's impairments met Listing 12.05(C); therefore, he was entitled to continuing benefits. [Doc. 15 at 6–11; Doc. 17 at 4–5.]  Plaintiff also argues the ALJ failed to properly evaluate the opinion of Plaintiff's treating physician in accordance with the Fourth Circuit's Treating Physician Rule. [Doc. 15 at  12–16; Doc. 17 at 1–3.]

The Commissioner contends that substantial evidence supports the ALJ's finding that Plaintiff does not meet Listing 12.05(C).  [Doc. 16 at 10–15] The Commissioner also contends the ALJ properly considered and weighed the opinion of Plaintiff's treating physician Dr. Evans. [*Id*. at 15–17.]

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963)) ("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is

4

evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *See Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012); *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano,* 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994). Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'" *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42

5

U.S.C. § 405(g)).  Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose."  *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g).  *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision).  To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim.  *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled).  Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four is usually the proper course to allow the Commissioner to explain the basis for the decision or for additional investigation. *See Radford v. Comm'r*, 734 F.3d 288, 295 (4th Cir. 2013) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985);*see also Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence).  On remand under

sentence four, the ALJ should review the case on a complete record, including any new material evidence. *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand."). After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction. *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[5] With remand under sentence

---

[5]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the

six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98. The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings. *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability. 42 U.S.C. § 423(a). "Disability" is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.    The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions.

---

Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence. *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD-09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992). Further, the Supreme Court of the United States has not suggested *Borders'* construction of § 405(g) is incorrect. *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990). Accordingly, the Court will apply the more stringent *Borders* inquiry.

*See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims). The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment. 20 C.F.R. § 416.920. Through the fourth step, the burden of production and proof is on the claimant. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). The claimant must prove disability on or before the last day of her insured status to receive disability benefits. *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969). If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience. *Grant*, 699 F.2d at 191. If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary. 20 C.F.R. § 416.920(a)(4); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.    *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. § 416.972(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* § 416.972(b). If an individual has earnings from

employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity. *Id.* § 416.974–.975.

**B.** **_Severe Impairment_**

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *See id.* § 416.921. When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G). The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses. *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them"). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments."). If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process." 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

**C.** **_Meets or Equals an Impairment Listed in the Listings of Impairments_**

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration

requirement found at 20 C.F.R. § 416.909, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience.[6]     20 C.F.R. § 416.920(a)(4)(iii), (d).

### D.    *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant."  *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995).  At this step of the evaluation, the ALJ compares the claimant's residual functional capacity[7] with the physical and mental demands of the kind of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work.  20 C.F.R. § 416.960(b).

### E.    *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *See* 20 C.F.R. § 416.920(f)–(g); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992).  To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids").  Exclusive reliance on the "grids" is appropriate where the claimant suffers

---

[6]The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. §§ 416.911, 416.925.

[7]Residual functional capacity is "the most [a claimant] can still do despite [his] limitations."  20 C.F.R. § 416.945(a)(1).

primarily from an exertional impairment, without significant nonexertional factors.[8]  20

C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e);  *Gory v. Schweiker*, 712 F.2d 929, 930–31

(4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving

exertional limitations).  When a claimant suffers from both exertional and nonexertional

limitations, the grids may serve only as guidelines.  *Gory*, 712 F.2d at 931.  In such a case,

the Commissioner must use a vocational expert to establish the claimant's ability to

perform other work.  20 C.F.R. § 416.969a;  *see Walker*, 889 F.2d at 49–50 ("Because we

have found that the grids cannot be relied upon to show conclusively that claimant is not

disabled, when the case is remanded it will be incumbent upon the [Commissioner] to

prove by expert vocational testimony that despite the combination of exertional and

nonexertional impairments, the claimant retains the ability to perform specific jobs which

exist in the national economy.").  The purpose of using a vocational expert is "to assist the

ALJ in determining whether there is work available in the national economy which this

particular claimant can perform."  *Walker*, 889 F.2d at 50.  For the vocational expert's

testimony to be relevant, "it must be based upon a consideration of all other evidence in

the record, . . . and it must be in response to proper hypothetical questions which fairly set

out all of claimant's impairments."  *Id.* (citations omitted).

---

[8]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs.  20 C.F.R. § 416.969a(a).  A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands.  *Id.* Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing.  § 416.969a(c)(1).

## II.    Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  The ALJ is required to inquire fully into each relevant issue.  *Snyder*, 307 F.2d at 520.  The performance of this duty is particularly important when a claimant appears without counsel.  *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980).  In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Id.* (internal quotations and citations omitted).

## III.    Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight.  20 C.F.R. § 416.927(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the

13

opinion, 20 C.F.R. § 416.927(c).  Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. § 416.927(c)(2).  An ALJ determination coming down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways.  *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986).  Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  20 C.F.R. § 416.927(d).  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  *Id.*

## IV.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also Conley v.*

14

*Bowen*, 781 F.2d 143, 146 (8th Cir. 1986). The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability. 20 C.F.R. § 416.917. Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. *Id.*

## V.    Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis. *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion). First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'" *Id.* (quoting *Craig*, 76 F.3d at 594). Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain." *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re

not supported fully by objective observable signs." *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 416.928.  Indeed, the Fourth Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v. Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990).  The Commissioner thereafter issued the following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence.  If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability.  Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered.  Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity,

> severity, degree or functional effect of pain is not determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990).  SSR 90-1p has since been

superseded by SSR 96-7p, which is consistent with SSR 90-1p.  *See* SSR 96-7p, 61 Fed.

Reg. 34,483-01 (July 2, 1996).  SSR 96-7p provides, "If an individual's statements about

pain or other symptoms are not substantiated by the objective medical evidence, the

adjudicator must consider all of the evidence in the case record, including any statements

by the individual and other persons concerning the individual's symptoms."  *Id.* at 34,485;

*see also* 20 C.F.R. § 416.929(c)(1)–(c)(2) (outlining evaluation of pain).

## VI.    Credibility

The ALJ must make a credibility determination based upon all the evidence in the

record.  Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ

must articulate specific and adequate reasons for doing so, or the record must be obvious

as to the credibility finding.  *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985).

Although credibility determinations are generally left to the ALJ's discretion, such

determinations should not be sustained if they are based on improper criteria.  *Breeden*,

493 F.2d at 1010 ("We recognize that the administrative law judge has the unique

advantage of having heard the testimony firsthand, and ordinarily we may not disturb

credibility findings that are based on a witness's demeanor.  But administrative findings

based on oral testimony are not sacrosanct, and if it appears that credibility determinations

are based on improper or irrational criteria they cannot be sustained.").

## APPLICATION AND ANALYSIS

**Listing Analysis**

Plaintiff argues that the ALJ failed to properly evaluate whether Plaintiff met 12.05(C) of the listings.[9]  [Doc. 15 at 11–16.]  The Court agrees.

To determine whether the plaintiff's impairments meet or equal a listed impairment, the ALJ identifies the relevant listed impairments and compares the listing criteria with the evidence of the plaintiff's symptoms. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (stating that without identifying the relevant listings and comparing the plaintiff's symptoms to the listing criteria, "it is simply impossible to tell whether there was substantial evidence to support the determination"); *Beckman v. Apfel*,  No. WMN-99-3696, 2000 WL 1916316, at *9 (D. Md. Dec. 15, 2000) (unpublished opinion) ("In cases where there is 'ample factual support in the record' for a particular listing, the ALJ must provide a full analysis to determine whether the claimant's impairment meets or equals the listing." (quoting *Cook*, 783 F.2d at 1172)).

Listing 12.05 reads as follows:

> Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A.     Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating,

---

[9] The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. §§ 416.911 and 416.925.

dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

Or

B.    A valid verbal, performance, or full scale IQ of 59 or less;

Or

C.    A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

Or

D.    A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1.    Marked restriction of activities of daily living; or

2.    Marked difficulties in maintaining social functioning; or

3.    Marked difficulties in maintaining concentration, persistence, or pace; or

4.    Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.[10]

To meet Listing 12.05, a claimant must satisfy the "diagnostic description" in the introductory paragraph and any one of the four sets of criteria—A, B, C, or D. *Id.* § 12.00A. The diagnostic description describes intellectual disability as "significantly sub-average

---

[10]The language in Listing 12.05 changed from mental retardation to intellectual disability on September 3, 2013.  SSA-1012-0066, 78 FR 46499 (Aug. 1, 2013).  Therefore, some of Plaintiff's documentation use mental retardation and some use intellectual disability.

general intellectual functioning with deficits in adaptive functioning." *Id.* § 12.05. The Administration "has never adopted a standard of measurement for the term 'deficits in adaptive functioning' in the capsule definition of Listing 12.05." *Wall v. Astrue*, 561 F.3d 1048, 1073 (10th Cir. 2009) (Holloway, J., dissenting). The Administration has noted that the definition of intellectual disability in its Listings is "consistent with, if not identical to, the definitions of [intellectual disability] used by the leading professional organizations."[11] Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20,018-01, 20,022 (Apr. 24, 2002); *but see Cox v. Astrue*, 495 F.3d 614, 618 n.4 (8th Cir. 2007) (noting that "the medical standard for [intellectual disability] is not identical to the legal standard"). Medical professional organizations have stated that deficits in "adaptive functioning" can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002) (quoting American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed., Text Revision 2000) ("DSM-IV-TR")) (noting the similarity between

---

[11]The Administration explained that, in the United States, each of the four major professional organizations has its own definition. Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20,018-01, 20,022 (Apr. 24, 2002). However, although each requires "significant deficits in intellectual functioning," which is evidenced by low IQ scores, "age of onset and the method of measuring the required deficits in adaptive functioning differ among the organizations." *Id.* Moreover, the Administration has discussed the definitions utilized by the American Psychiatric Association but has specifically stated that it endorses no organization's methodology over another. *Id.* In fact, when the Administration revised the listings in 2002, it declined a proposal to incorporate the American Psychiatric Association definition of intellectual disability into Listing 12.05. *Id.* The Administration's definition "establishes the necessary elements, while allowing use of any of the measurement methods recognized and endorsed by the professional organizations." *Id.*

the American Association on Mental Retardation and the American Psychiatric Association's definitions of mental retardation[12]).  Further, in addition to producing deficits in adaptive functioning, the claimant's intellectual disability must have "initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."[13]  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

In addition to showing deficits in adaptive functioning prior to age 22, to meet the criteria of 12.05(C), the claimant must establish he has an IQ between 60 and 70 and "a physical or other mental impairment imposing an additional and significant work-related limitation of function."  *Id.* § 12.05(C).  The presence of a significant work-related limitation of function that renders the claimant unable to perform his past relevant work satisfies the "additional and significant" requirement of Listing 12.05(C).  *Rainey v. Heckler*, 770 F.2d 408, 410–11 (4th Cir. 1985).

### Evidence Prior to the June 2011 SSI Redetermination

The record indicates that, as a young child, Plaintiff had difficulty in school performing at or below basic level in math, English, science, and social studies.    [R. 168–176.]    Plaintiff claimed disability beginning November 1, 2005 due to ADHD and borderline intellectual functioning.  [R. 91.]

---

[12]The Fourth Circuit Court of Appeals has approved the use of the American  Association of Mental Retardation's standards for measuring adaptive skills in reviewing the denial of a writ of habeas corpus under 28 U.S.C. § 2254.  *See Green v. Johnson*, 515 F.3d 290, 302 (4th Cir. 2008), *cert. denied*, 128 S. Ct. 2999 (2008) (finding Virginia Supreme Court's determination that the petitioner had failed to show his claim of mental retardation was not contrary to clearly established federal law).

[13]Medically, a diagnosis of mental retardation requires a finding that the patient's intellectual limitations began in childhood.  DSM-IV-TR, at 54.

On July 16, 2003, Plaintiff was tested by his school psychologist Alan Cranston ("Mr. Cranston") at Pate Elementary to evaluate Plaintiff and gather information needed in continued support from the exceptional children's program in the Darlington County school district. [R. 242.] In July 2003, Plaintiff had completed the third grade and his teachers reported delay in all areas of academic skill development. [*Id*.] Plaintiff had been receiving support from the learning disabled program for several years due to his history of significant delays in reading, writing, and math skill mastery. [*Id*.] Plaintiff was tested using the Wechsler Intelligence Scale for Children Edition ("WISC-III") resulting in a Verbal IQ of 78; Performance IQ of 75; and a Full Scale IQ of 75. [*Id*.] Plaintiff's performance placed him in the borderline range of learning ability. [R. 243.] Mr. Cranston summarized his findings as follows:

> [Plaintiff's] current performance places him withing the borderline range of learning ability as sampled with the WISC-III. Vocabulary seemed very weak and [Plaintiff] had a lot of difficulty providing age appropriate responses to social and common sense judgment questioning. Abstract reasoning appeared below average in verbal and nonverbal tasks. Math concepts were poor with and without use of paper and pencil during problem solutions. Memory seemed weak when [Plaintiff] was asked to retrieve information stored over long and short period of time through visual and auditory channels.

[R. 243.]

On September 21, 2003, Plaintiff was examined by the school psychologist Kaye Rivers, Ph.D. ("Dr. Rivers") following dismissal from special education because of parental request and referral by physician for placement as "other health impaired." [R. 247.] Dr. Rivers noted that Plaintiff's ability and skills on medication seemed significantly different within the area of nonverbal intelligence measures then when he was off medication. [R. 248.] Plaintiff's academics on and off medication also showed greatly enhanced reading

and math scores while written expression scores remained consistent in both testing situations. [*Id*.] Dr. Rivers recommended Plaintiff be placed as "learning disabled" rather than "other health impaired." [*Id*.]

During the 2005–2006 school year, Plaintiff's sixth grade year, Plaintiff's individualized education plan ("IEP") shows him reading at a 2.7 grade equivalent; doing math at a 4.0 grade equivalent; and engaging in written expression at a below grade level. [R. 252.] It was noted that Plaintiff's disability was a hindrance to his progress in the general curriculum. [*Id*.]

On March 9, 2006, Plaintiff underwent a mental status exam by Dan H. Allen, Ph.D. ("Dr. Allen") at the request of disability examiner Michael Pawley. [*See*, R. 270–274.] Test results from the WISC-III indicated a verbal score of 63; a performance score of 75; and a full scale score of 67. [R. 271.] Dr. Allen noted the results of the previous WISC-III from July 2003 showed a significantly higher verbal score (78) and full scale score (75) [*id*.] and explained that the deterioration of Plaintiff's verbal skills was not unusual in a child at this level of functioning since there is an increasing emphasis on verbal material as he progresses through school [R. 272]. Dr. Allen diagnosed Plaintiff as being in the mild to low-borderline mental deficiency; ADHD, inattentive type; and with moderate learning problems and difficulties with focus and attention. [R. 273.]

On May 12, 2011, Plaintiff underwent a psychological evaluation by Cashton B. Spivey, Ph.D. ("Dr. Spivey") at the request of disability examiner Karen Vereen. [*See* R. 308–311.] Plaintiff, then 18 years old, was referred for assessment in order to evaluate his intellectual, cognitive, and academic achievement functioning and to aid in the

determination of his eligibility for disability benefits. [R. 308.] On the Wechsler Adult Intelligence Scale, Fourth Edition, Plaintiff scored a 66 on verbal comprehension; 67 on perceptual reasoning; 71 on working memory; 71 on processing speed; and a Full Scale IQ score of 63. [R. 310.] Dr. Spivey noted that Plaintiff's verbal comprehension and perceptual reasoning scores fell in the mentally retarded range while his working memory and processing speed scores fell in the borderline range. [*Id*.] Dr. Spivey concluded that Plaintiff's Full Scale IQ score also fell into the mentally retarded range and that he appeared to be an individual who operated primarily in the mental retarded intellectual range. [*Id*.] On the WRAT-4 test, Plaintiff's scores showed him at a grade equivalent of 2.4 in word reading; 2.0 in spelling; and 2.2 in math computation. [*Id*.] These scores fell into the mentally retarded range as well. [*Id*.] Dr. Spivey diagnosed Plaintiff with mild mental retardation, headaches, and academic problems and ruled out depressive disorder. [R. 311.]

On June 13, 2011, Holly Hadley Psy.D. ("Dr. Hadley") completed a psychiatric review technique form based on Listings 12.02 (Organic Mental Disorders) and 12.05 (Mental Retardation). [R. 312.] Upon reviewing Plaintiff's medical records, Dr. Hadley concluded that Plaintiff did not meet Listing 12.02 because he did not have current treatment or diagnosis for ADHD; and Plaintiff did not meet Listing 12.05 because, although he had a full scale IQ of 63, his adaptive functioning was more consistent with borderline intellectual functioning. [R. 313, 316.] Dr. Hadley concluded Plaintiff would have moderate degrees of limitation in is activities of daily living; social functioning; and the maintenance of concentration, persistence, and pace. [R. 322.] Dr. Hadley noted that she reviewed Plaintiff's IEP's from Darlington County Schools; prior file from March 9, 2006

24

where Plaintiff had a Full Scale IQ of 67; Dr. Spivey's May 2011 evaluation showing a Full Scale IQ of 63 and a diagnosis of mild mental retardation; and notes from vocational rehabilitation showing Plaintiff's participation in hopes of beginning to work upon graduation. [R. 324.]  The same day, Dr. Hadley completed a mental RFC finding Plaintiff was not significantly limited in his ability to: remember locations and work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation.  [R. 326.]  She found he was moderately limited in his ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; complete normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and set realistic goals or make plans independently of others. [R. 327.]

### *Evidence During the Unadjudicated Period*

On April 17, 2012, Plaintiff saw his primary care physician Dr. Bonnie Crickman ("Dr. Crickman") of McLeod Physician Associates for a medication refill for his ADHD. [R. 357.] On June 14, 2012, Plaintiff presented to Dr. Prakash Beeraka, M.D. of McLeod Physician Associates complaining of a headache and a painful swelling/knot like feeling in his left groin. [R. 354.] It was recommended that Plaintiff go to the emergency room to evaluate the groin pain. [R. 355.] On August 12, 2012, Plaintiff presented Dr. Crickman on follow up for his ADHD and for a knot in his groin area. [R. 352.] On December 12, 2012, Plaintiff saw Dr. Crickman complaining of excessive sleepiness. [R. 350.] On December 30, 2012, Plaintiff underwent a diagnostic polysomnogram (overnight multi-channel sleep study)for his fatigue and excessive sleepiness conducted by Dr. Ifeanyi Eruchalu ("Dr. Eruchalu"). [R. 361.] The test discovered no significant obstructive sleep apnea and no significant cardiac arrhythmia. [*Id*.] Dr. Eruchalu concluded Plaintiff needed additional clinical evaluation to determine the etiology of his sleepiness. [*Id*.] On February 12, 2013, Plaintiff presented to Genesis Health Care for his somnolence and to establish with a new medical provider. [R. 364.]

Plaintiff first saw Dr. Walter Evans ("Dr. Evans") with Comprehensive Neurological Services, P.C. on February 21, 2013 for his ADHD and somnolence complaints. [R.371.] Dr. Evans noted that he would order a sleep study and test for narcolepsy and that he would hold off on giving Plaintiff "medication for ADD until" the sleep test results were completed. [R. 374.] On April 24, 2013, Plaintiff presented to Dr. Evans for evaluation related to his ADHD and drowsiness/stupor. [*See* R. 367–374.] At this visit, Dr. Evans reviewed the results from Plaintiff's sleep study, started Plaintiff on Adderall XR, and

ordered the narcolepsy blood work evaluation.  [R. 370.]  On the same day, Dr. Evans completed a *§8.5 Medical Statement Regarding Physical and Mental Abilities and Limitations for Social Security Disability Claim* indicating that Plaintiff, who was diagnosed with ADHD and excessive daytime somnolence, was limited to: standing for 60 minutes at one time, sitting for 15 minutes at one time, working for one hour per day, lifting ten pounds occasionally and five pounds frequently, never bending or stooping, constant manipulation with the right/left hand, frequent raising of the left/right arm over shoulder level, and having no need to elevate legs during an eight-hour work day.  [R. 367.]   With respect to psychiatric limitations, Dr. Evans noted that Plaintiff was not significantly impaired in his ability to work with others; was moderately impaired in his ability to get along with coworkers; was markedly impaired in his ability to interact appropriately with the general public and to accept supervision; and was extremely impaired in his ability to understand, remember, and carry out very short and simple instructions;  understand, remember and carry out detailed instructions; and maintain attention and concentration.  [*Id*.]

On May 2, 2013, LabCorp send the results of Plaintiff's narcolepsy evaluation showing that Plaintiff was positive for DQA1*01 and negative for DQB1*05.  [R. 379, 381.] Plaintiff saw Dr. Evans again on September 24, 2013 and advised he was unable to obtain the Adderall XR because his insurance would not cover it.  [R. 380.]  Treatment notes indicate his chronic problems include attention deficit, nonhyperactive and narcolepsy with Cataplexy.  [*Id*.]  Dr. Evans prescribed 20 milligrams of Adderall and scheduled Plaintiff for a 4-month follow up with him and monthly follow ups with the nurse in the interim.  [R. 381.]

### *The ALJ's Evaluation*

Here, the ALJ ignored substantial evidence indicating that Plaintiff exhibited deficits in adaptive functioning during his developmental period; and discredited Plaintiff's IQ scores without sufficient explanation.  In this case, the ALJ found that "[w]hile the evidence in this case does show some recent low IQ scores, that evidence (including his regular activities, living and social situation, educational history, and medical information) does not reveal significant deficits in adaptive functioning."  [R. 15.]    However, this finding is not supported by substantial evidence in the record before the ALJ.[14]

---

[14] "When a claimant for benefits satisfies the disability listings, benefits are due notwithstanding any prior efforts of the claimant to work despite the handicap.'" *Luckey v. U.S. Dep't of Health & Human Servs.*, 890 F.2d 666, 669 (4th Cir. 1989) (quoting *Murphy v. Bowen*, 810 F.2d 433, 438 (4th Cir. 1987)); *see also Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (stating that when a claimant satisfies a listing by meeting all its specified medical criteria, she presumably qualifies for benefits); *Ambers v. Heckler*, 736 F.2d 1467, 1469–70 (11th Cir. 1984) (finding that a mentally retarded claimant who was gainfully employed in the past is disabled upon the cessation of employment).  As more fully explained by one district court:

> [The] DSM-IV and Listing 12.05(C) assume many, if not most, mildly mentally retarded individuals will be able to work.  However, they recognize that some mildly mentally retarded individuals may be unable to work where they have "a physical or other mental impairment imposing an additional and significant work-related limitation of function."  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05(C).  This listing implies that such an individual will be able to work unless he has, or until he develops, a severe physical or additional mental impairment.  *Therefore, the fact that plaintiff has a history of continuous employment in the past is irrelevant to whether he has subsequently become disabled due to the development of additional severe impairments.*

*Muntzert v. Astrue*, 502 F.Supp.2d 1148, 1158 (D. Kan. 2007) (emphasis added); *see also Davis v. Astrue*, C/A No. 2:07-1621-JFA-RSC, 2008 WL 1826493, at *4 (D.S.C. Apr. 23, 2008) ("While [the claimant] had been able to function in a work setting, listing 12.05C anticipates that a [claimant] of limited intellectual ability will be more severely limited, and

*Adaptive Functioning*

A review of case law suggests that the issue of whether a claimant manifested deficits in adaptive functioning during the developmental period is a fact-specific inquiry with few bright-line rules. *Accord Salmons v. Astrue*, No. 5:10-cv-195–RLV, 2012 WL 1884485, at *5–7 (W.D.N.C. May 23, 2012).  Cases interpreting Listing 12.05(C) provide some parameters for an ALJ's conclusion on this issue.  *Compare Hancock v. Astrue*, 667 F.3d 470, 475–76 (4th Cir. 2012) (affirming Commissioner's determination that claimant did not have the requisite deficits in adaptive functioning where the claimant had worked as a battery assembler and a drop clipper; performed tasks such as shopping, paying bills, and making change; took care of three small grandchildren at level acceptable to the state Department of Social Services; did a majority of the household chores, attended school to obtain a GED; and did puzzles for entertainment), *with Rivers v. Astrue*, C/A No. 8:10-314-RMG, 2011 WL 2581447 (D.S.C. June 28, 2011) (reversing finding of no deficits in adaptive functioning where claimant was functionally illiterate, showed poor academic performance with multiple IQ tests in or before the third grade showing scores in the 50s, and dropped out of school in the ninth grade).

By way of further example, courts have found that functional illiteracy in and of itself is a deficit in adaptive functioning.  *Davis*, 2008 WL 1826493, at *4 (citing the DSM-IV-TR). Another guiding factor is whether the claimant has ever provided care for others, or, conversely, whether he himself is dependent on others for care. *Compare Salmons*, 2012 WL 1884485, at *7 (noting claimant was heavily dependent on his mother and was not

---

disabled when faced with other severe impairments.").

29

responsible for the care or supervision of anyone else) and *Holtsclaw v. Astrue*, 1:10-cv-199, 2011 WL 6935499, at *4–5 (W.D.N.C. Mar. 22, 2012) (noting claimant had never lived independently and required a parent's help), *with Hancock*, 667 F.3d at 475–76 (affirming denial of benefits where the claimant managed the household and cared for her three young grandchildren) and *Caldwell v. Astrue*, No. 1:09-cv-233, 2011 WL 4945959, at *3 (W.D.N.C. Oct.18, 2011) (noting claimant assisted in the care of an elderly parent).

The record shows that at least one evaluating physician, Dr. Spivey, found that Plaintiff's full scale IQ score of 63 and his verbal comprehension and perceptual reasoning scores fell in the mentally retarded range and diagnosed Plaintiff with mild mental retardation.  [R. 310–311.]  The DSM-IV-TR defines mental retardation as a combination of "significantly subaverage intellectual functioning (an IQ of approximately 70 or below)" and "significant limitations in adaptive functioning" in at least two skill areas.  DSM-IV-TR, at 41.  As previously noted, these skill areas include communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.  *Id.*  Thus, a diagnosis of mental retardation, in and of itself, is evidence of deficits in adaptive functioning in at least two skill areas.

Further, evidence in the record before the ALJ showed Plaintiff did poorly in school; was identified in his IEP as learning disabled; was assessed with moderate learning problems and difficulties with focus and attention; and at the age of 18 years old, tested at a grade equivalent of 2.4 in word reading, 2.0 in spelling and 2.2 in math computation. Academic achievement testing from 2003, performed by the school psychologist Mr. Cranston, revealed Plaintiff to be severely deficient in his intellectual abilities in that his vocabulary seemed very weak; Plaintiff had difficulty providing age appropriate responses

30

to social and common sense judgment questions; abstract reasoning appeared below average in verbal and non-verbal tasks; math concepts were poor; and memory seemed week when asked to retrieve information stored over long and short periods of time.  [R. 243.]  In light of this evidence, the ALJ was obligated to explain  her consideration of this evidence as well as her reasoning for finding that Plaintiff's learning deficits, academic performance, and diagnosis of mild mental retardation did not require a finding that Plaintiff exhibited deficits in adaptive learning necessary to meet Listing 12.05(C).  Upon review, the Court finds that the record contains substantial evidence to support a finding that Plaintiff displayed defects in adaptive functioning.  Moreover, no medical professional put forth an opinion that Plaintiff was faking low intelligence or that the IQ scores were lower than expected based on Plaintiff's academic and vocational background.  Accordingly, the ALJ's finding that Plaintiff failed to show deficits in adaptive functioning is not supported by substantial evidence.[15]

### IQ Score

To meet Listing 12.05(C), the claimant must show a "valid verbal, performance, or full scale IQ of 60 through 70."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C).  The ALJ does not determine whether IQ scores are legitimate. *See Jackson v. Astrue*, No. 8:08-2855, 2010 WL 500449, at *5 (D.S.C. Feb. 5, 2010) (finding the ALJ improperly interpreted

---

[15]The ALJ concluded that Plaintiff did not have any deficits in adaptive functioning, and, thus, never discussed the next prong of Listing 12.05(C) ("*whether deficits manifested during the developmental phase*").  Because the Court has found that the ALJ's finding is not supported by substantial evidence, and that there is evidence of record supporting a finding that Plaintiff exhibited deficits in adaptive functioning, on remand, the ALJ is to address this factor in light of the law of the Circuit.

evidence when the ALJ, on his own, not by weighing conflicting medical opinions, found the plaintiff's daily activities did not comport with her IQ scores); *see also Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("[A]n ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so."); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (noting an ALJ is "not qualified to interpret raw medical data in functional terms"); *Davis v. Heckler*, 884 F.2d 1394, 1989 WL 104466, at *4 (9th Cir. Sept. 1, 1989) (unreported table decision) (finding an ALJ impermissibly substitutes his opinion for that of a treating physician when the ALJ rejects a physician's opinion that rests on substantial medical evidence); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985) ("[A]n ALJ is not free to set his own expertise against that of a physician who presents competent evidence.").  Although the regulations permit the ALJ to consider evidence in addition to an IQ score, a general discussion of the claimant's activities and an ALJ's intuition are not sufficient to overcome medical evidence; the ALJ cannot substitute his own judgment and disregard IQ scores.  *Dozier v. Comm'r of Soc. Sec.*, 736 F. Supp. 2d 1024, 1037 (D.S.C. 2010).  As stated in *Maybank v. Astrue*,

> Generally, the results obtained by a licensed psychologist following administration of accepted intelligence tests are entitled to considerable weight in Social Security cases although they are not required to be accepted.  The Commissioner may, however, reject such scores if they are inconsistent with other substantial evidence in the record such as conflicting professional opinions or other record evidence indicating that the claimant is historically higher achieving or has more advanced functional capacities than would be expected from someone with a below-average I.Q.  Indeed, test results of this sort should be examined to assure consistency with daily activities and behavior.

No. 4:08-643, 2009 WL 2855461, at *11 (D.S.C. Aug. 31, 2009) (internal citations omitted); *see also Markle v. Barnhart*, 324 F.3d 182, 186 (3d Cir. 2003) (same); *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998) (citations omitted) (same).

In her decision, the ALJ concluded that Plaintiff's "recent scores do not demonstrate disabling intellectual disability in the claimant." [R. 15.] Other than this single conclusory statement, the ALJ failed to explain her basis for discounting valid IQ scores within the range required for Listing 12.05(C). There is no evidence in the record that indicates Plaintiff's IQ scores are conflicting or inconsistent with his functional capacities. And no treating or consulting medical professional raised any doubt as to Plaintiff's efforts on the testing or as to his low intellectual function. *Cf. Clay v. Barnhart*, 417 F.3d 922, 930–31 (8th Cir. 2005) (involving two different sets of IQ scores, where one doctor's found that the claimant failed to put forth serious effort on the IQ test and the other doctor found his IQ results where invalid because he was convinced the claimant was malingering); *Johnson v. Barnhart*, 390 F.3d 1067, 1071 (8th Cir. 2004) (holding ALJ properly discounted results of two IQ tests where there was evidence the claimant malingered during the tests). In the absence of an explanation by the ALJ, the Court can find no basis in the law for the ALJ's complete disregard of Plaintiff's IQ scores in the presence of Plaintiff's consistently low IQ scores and the absence of evidence of malingering.

Additionally, the Court notes the Commissioner has recognized that an individual's IQ tends to stabilize by age sixteen, that consistency among sub-test scores increases confidence in the test's accuracy, and that the practice of inferring low IQ during the developmental period from testing done later in life has been approved. *Davis*, 2008 WL 1826493, at *4 (citing 65 Fed. Reg. 50,746, 50,772 (Aug. 20, 2000)). Therefore, the ALJ's

33

disregard of Plaintiff's IQ scores, in light of all other evidence of record, is not supported by substantial evidence.

**Treating Physician Opinion**

Here, Plaintiff claims that, in addition to his intellectual disability, he suffers from narcolepsy. Plaintiff also claims the ALJ erred in rejecting his treating physician's diagnosis of narcolepsy. The ALJ, upon reviewing the medical documentation, determined that "there was no objective findings to establish the diagnosis" and determined that Dr. Evan's findings were equivocal. [R. 14.] Thus, the Court is left to review the ALJ's treatment of Dr. Evan's opinion regarding Plaintiff's diagnosis of narcolepsy.

If the claimant can show evidence of deficits in adaptive functioning prior to age 22, and an IQ that falls within the range required by Listing 12.05(C), then the inquiry is whether the claimant suffers from any additional physical or mental impairment significantly limiting work-related functions. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C); *Kennedy v. Heckler*, 739 F.2d 168, 172 (4th Cir. 1984). While a claimant may have previously been able to function in a work setting, Listing 12.05(C) anticipates that a claimant of limited intellectual ability will be more severely limited, and disabled, when faced with other severe impairments. *Davis*, 2008 WL 1826493, at *4.

The ALJ is obligated to evaluate and weigh medical opinions "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing

34

20 C.F.R. § 404.1527).  Courts typically "accord 'greater weight to the testimony of a treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Id.* (*quoting Mastro*, 270 F.3d at 178). While the ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, *Craig*, 76 F.3d at 590, the ALJ must still weigh the medical opinions based on the factors listed in 20 C.F.R. § 404.1527(c).

In undertaking review of the ALJ's treatment of a Plaintiff's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.  A review of the ALJ's decision, however, fails to show that the ALJ reviewed the medical opinion of Plaintiff's treating physicians, specifically Plaintiff's diagnosis of narcolepsy by Dr. Evans, in accordance with the factors in 20 C.F.R. § 404.1527(c).  In fact, the ALJ fails to specifically address any of these factors set forth in the Treating Physician Rule.

Several Circuits have held that "where there is no competing evidence, the ALJ is not permitted to substitute his opinions for those of the examining doctors." *Grecol v. Halter*, 46 Fed. App'x 773 (6th Cir.2002) (remanding the case for consideration of plaintiff's psychological condition where there was no evidence that plaintiff's examining doctor's opinion was incorrect); *see also Ness v. Sullivan*, 904 F.2d 432 (8th Cir.1990) (finding that the ALJ erred by substituting his observation that plaintiff did not appear to be depressed or unhealthy during the hearing for the opinion of plaintiff's doctor that plaintiff was suffering from depression); *Ramos v. Barnhart*, 60 Fed. App'x 334, 336 (1st Cir.2003)

(concluding that the ALJ substituted his own lay opinion for the uncontroverted medical evidence where the ALJ concluded that plaintiff did not have an impairment that was diagnosed by two examining physicians and not rejected by any examining physician). While the Fourth Circuit Court of Appeals has not directly stated this proposition, the court has reversed and remanded the case where the ALJ substituted his opinion for the uncontradicted opinion of an examining physician. *See Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir.1984) (finding that the ALJ substituted expertise he did not possess in the field of orthopedic medicine for the opinion of an examining physician that was supported by the findings of a treating physician).

In this case, the ALJ dismissed a diagnosis of narcolepsy by Plaintiff's treating neurologist explaining that

> Some information has suggested possible narcolepsy in the claimant, but there are no objective findings to establish that diagnosis. A note from the claimant's treating neurologist dated April 24, 2013, states that a multiple sleep latency test showed an absence of certain specific findings that ruled against a diagnosis of narcolepsy (Exhibit 16F, pages 2-4 ). Following the hearing, the claimant's attorney submitted the results of laboratory testing ordered by Dr. Evans to further evaluate him for narcolepsy. Those results were equivocal, with one indicator being positive and the other being negative (Exhibit 17F). In the absence of further analysis or explanation of those results by the laboratory performing the tests or by Dr. Evans, they provide no objective support for a diagnosis of narcolepsy.

[R. 14.]   Upon consideration, however, the Court finds no basis in the medical evidence of record for the ALJ's conclusion other than the impermissible substitution of the ALJ's opinion for the uncontradicted opinion of a treating physician.

As an initial matter, no medical provider, other than Dr. Evans has suggested the meaning of Plaintiff's test results.  As noted in his September 2013 visit, Dr. Evans, a

36

physician certified in neurology, clinical neurophysiology and sleep medicine, and after conducting testing and analyzing blood work, concluded that Plaintiff's chronic problems were attention deficit non-hyperactive and narcolepsy with Cataplexy.  [R. 380.]  There is no evidence suggesting that the results of the blood work required a contrary finding. Additionally, the ALJ failed to address any of the factors for evaluating a Treating Physician's opinion in this Circuit.  Consequently, the Court finds the ALJ's finding that Plaintiff does not suffer from any additional physical or mental impairment significantly limiting work-related functions is not supported by substantial evidence.

## **CONCLUSION**

Wherefore, based upon the foregoing, the Court recommends the Commissioner's decision be REVERSED and the case be REMANDED to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative action consistent with this recommendation.

**IT IS SO RECOMMENDED**.

s/Jacquelyn D. Austin
United States Magistrate Judge

January 29, 2016
Greenville, South Carolina